Frederic A. LANG, Plaintiff and
Counterclaim Defendant,

v.

The PRESCON CORPORATION, Defend-
ant and Counterclaim Plaintiff,

v.

PIC INCORPORATED, Counterclaim
Defendant.

Civ. A. No. 76–432.

United States District Court,
D. Delaware.

Aug. 13, 1982.

9.

Harold Pezzner, Connolly, Bove & Lodge, Wilmington, Del. (Sidney David, Lerner, David, Littenberg & Samuel, Westfield, N. J., of counsel), for Frederic A. Lang and PIC Inc.

Richard P. Beck, Morris, James, Hitchens & Williams, Wilmington, Del. (Paul Van-Slyke, and Michael O. Sutton, Arnold, White & Durkee, Houston, Tex., of counsel), for The Prescon Corp.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This is an action for patent infringement of United States Letters Patent No. 3,646,748 (the "Lang Patent") brought by Frederic A. Lang against The Prescon Corporation ("Prescon"). Prescon has counterclaimed for a declaratory judgment of patent invalidity, noninfringement, and unenforceability.[1] A bifurcated trial was ordered with the liability phase of the case tried to the Court on March 16–26, 1982. The parties having submitted post-trial briefs, post-trial argument was heard on June 17, 1982. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

The initial application for the Lang patent was filed on March 24, 1970; the patent issued on March. 7, 1972 for an invention entitled "TENDONS FOR PRESTRESSED CONCRETE AND PROCESS FOR MAKING SUCH TENDONS." As indicated by its title, the invention disclosed by the Lang patent is a tendon for use in prestressing concrete as well as a method for making such tendons. A certain amount of background information will be required to put the current controversy in perspective.

Concrete is a brittle material which readily develops shrinkage cracks while drying. An untreated, plain concrete beam[2] is considered unsuitable for many purposes as it will not have the strength to support the required load. One method of reinforcing concrete is to apply force to compress it, thereby overcoming the effects of the cracks formed during the drying process. Concrete which has been compressed is known as prestressed concrete. An example given at trial will serve to illustrate the concept. A series of building blocks placed together can be lifted into the air if they are pressed together from both ends. Although the blocks themselves are not joined, the compressing force allows them to support the load of their own weight. If the force is released, the blocks will fall.

There are two common techniques for prestressing concrete: pretensioning and posttensioning. In pretensioning, a piece of steel is tensioned or stretched between two anchors called "deadmen" and anchored into place. The concrete is then poured around the steel so that the concrete beam is formed with the tensioned steel inside it. As the concrete cures and hardens it me-

---

1. Although Prescon also argued the Lang patent was invalid and unenforceable on the grounds of fraud or inequitable conduct in procuring the original patent and in seeking its reissue, those grounds were abandoned in its post-trial brief. Prescon's Post-trial Brief at 1 n.1, Doc. No. 244. The following abbreviations will be used throughout this opinion: Defendant's Trial Exhibit (DX), Plaintiffs' Trial Exhibit (PX), Trial Transcript (Tr.), Post-trial Argument Transcript (PTr.).

2. The principles discussed are applicable to concrete generally. The example of a concrete beam is used here because the principles involved can be most clearly demonstrated in that context.

chanically interlocks or bonds with the steel so that the steel cannot move independently of the concrete. The steel is then released from the deadmen and allowed to relax as far as it can. Inasmuch as the steel is bonded to the concrete, it is restrained from relaxing and the pressure it exerts compresses the concrete. This process is known as pretensioned prestressing because the steel is stretched before the concrete is poured.

In posttensioning, the steel is placed in the forms into which the concrete will be poured without being tensioned. The steel is coated with any of a variety of coverings to prevent the concrete from mechanically interlocking with the steel. After the concrete is poured and hardened, jacks are attached to the steel and it is stretched. Permanent anchors are attached to the stretched steel where it exits the concrete; it is these anchors pushing back against the concrete which serve to compress the concrete. This process is known as posttensioned prestressing because the steel is stretched after the concrete is poured.

In the early 1950's, high strength steel bars were used in the posttensioning process. By the late 1950's and early 1960's, some companies were using multiple wire strand instead of steel bars. In some cases, a number of such strands were laid parallel to each other in a large metal duct or plastic tube. Again concrete would be allowed to harden around the ducts before the strands were stretched. After the strands were anchored, the duct would be filled with grout or grease. At least as early as 1965 Prescon manufactured a tendon comprised of four parallel ¼ inch wires wiped with grease and spirally wrapped in brown paper. During the early 1960's, the use of a single 7-wire strand [3] was becoming prevalent. It too could be wrapped with grease and covered with spirally wound brown paper. (Tr. 1135–39).

The paper-wrapped, 7-wire strand, grease covered tendons had several problems. The paper tore readily during shipping and han-dling, necessitating costly and time-consuming repairs. In addition, the tendons had a tendency to leak, causing unsightly grease stains in the concrete. (Tr. at 1140). More fundamentally, paper-wrapped tendons had a serious problem with mechanical interlock (bonding) between the concrete and the steel. The weight of concrete at any particular point in a structure is equal to 150 pounds per cubic foot multiplied by the depth from the top of the pour. Thus, if a tendon were placed ten feet from the top of a form, it would be subjected to 1,500 pounds of force per square foot of its area. That force tended to squeeze the concrete into the interstices of the 7-wire strand and allow it to harden in that position. Once the concrete hardened, the tendon could not be tensioned without shearing the concrete at each of the places it had penetrated. It therefore became difficult to stretch the strand which in turn resulted in a reduced force applied by the anchors against the concrete. (Tr. at 162–64).

A second, although somewhat related problem, which may be referred to as "frictional forces," is best illustrated by reference to a simplified version of example 1 of the Lang patent.[4] A 200-foot length of tendon is placed in a circular form so as to be embedded circumferentially around one-half of a circular concrete vessel. After the concrete hardens, the tendon is stretched. As it is stretched the tendon will exert a force radially inward toward the center of the tank, pushing the steel against the paper and indirectly the concrete. The friction produced between the concrete, paper and steel strand tends to prevent the steel strand from being stretched, and, as a result, the anchors push against the concrete with less force. (Tr. at 160–62).

In response to these problems, several alternatives to paper-wrapped tendons were developed. One company, Stressteel Corporation, attempted to apply a plastic wrap in the same way as the paper wrap previously described. That method was abandoned be-

---

**3.** 7-wire strand consists of a core wire around which six similar wires are helically wrapped.

**4.** Example 1, Column 3–4, U.S. Patent No. 3,646,748.

**936**

cause Stressteel discovered that in applying the wrap, it had to tension the plastic to get it to stay in place. In so doing, they caused the plastic strip to conform to the helical shape of the individual strands which resulted in a high degree of mechanical interlock between the concrete and the finished tendon thereby making it difficult to stretch the strand. (Tr. 1142–45). After some further experimentation, Stressteel developed the so-called "push through" or "stuffed" tendon.[5] The push through tendon was comprised of an extruded tube, a 7-wire strand and grease. As its name implies, the tendon was produced by stuffing or pushing a greased 7-wire strand into a previously extruded plastic tube. (Tr. at 1145–47). In order to prevent damage to the plastic tube, Stressteel covered the end of each new length of strand with a bullet-nosed thimble. The thimbles guided the strand through the tube and were then removed. As a result, the inside of the plastic tube had to be greater than the diameter of the greased strand plus the thimble. (Tr. at 1148).

Another alternative to the paper wrapped tendon was the cigarette wrap or lap seam tendon. The cigarette wrap tendon includes a greased 7-wire strand around which a long plastic strip is curled so that the overlapping edges can be heat or glue sealed. The cigarette wrap tendons have loose jackets with a large air gap between the inside of the plastic jacket and the outside of the greased strand. (Tr. at 319–19A, 660–62).[6] Although the cigarette wrap was an improvement over the paper wrap, it still had serious drawbacks including a tendency to split at the seam. (Tr. at 828).

In 1965 Mr. Frederic Lang, the plaintiff, first became involved in posttensioning. At that time he developed a plastic coated lubricated wire which became the subject of an India patent. (DX207). The Lang India patent discloses an invention comprised of a smooth single wire coated with an oil lubricant over which was extruded a tightfitting plastic jacket. (Tr. 1984).

The patent in suit discloses yet another tendon for posttensioning and a process for manufacturing it. Specifically, the product invention is described in claim 1 of the Lang patent as:

A tendon suitable for posttensioning concrete and for use in other applications comprising a multiple-wire strand incased in a corrosion inhibitor, having a grease-like consistency relative to worked penetration, in an amount sufficient to provide a circular incasement around the strand of a diameter at least 2 mils [7] greater than the diameter of the strand, and having a seamless plastic jacket tightly covering said incased strand.

Claim 1, column 4–5, U.S. Patent No. 3,646,-748. (DX139).

The process by which that product is to be made is described in claim 6 of the Lang patent which provides:

A process for making a tendon suitable for use in the posttensioning of concrete and for use in other applications which comprises incasing a multiple-wire strand with a corrosion inhibitor having grease-like consistency, particularly relative to worked penetration and flow characteristics, smoothing and shaping said corrosion inhibitor so as to provide an incasement having a circular surface around the strand the diameter of the circle being at least 2 mils greater than the diameter of

5. Florida Wire & Cable also produced push through or stuffed tendons in the 1960's. (Tr. at 1184).

6. There was a factual dispute on this point in that at least one of defendant's witnesses, Mr. Danciger, testified that some lap seam tendons had tight jackets. As will be discussed *infra*, the evidence adduced at trial shed considerable doubt on Mr. Danciger's credibility. In contrast, to take but one example, the Court found the testimony of Professor Roland Richards,

plaintiff's expert witness, to be consistent, logical and believable. Professor Richards was among those who testified that lap seam tendons had loose jackets. Having observed the witnesses and weighed their credibility, the Court finds that lap seam tendons in fact had loose fitting plastic jackets.

7. A mil is equal to one one-thousandth of an inch.

the strand, and melt extruding and shrinking a seamless plastic tubular jacket around said incased strand to provide a tight jacket.

Claim 6, column 5–6, U.S. Patent No. 3,646,-748.

Simply stated, the Lang patent describes a posttensioning tendon in which a 7-wire steel strand is coated with a circular incasement of grease and then covered with an extruded[8] plastic jacket which "tightly" covers the grease-incased strand. Plaintiff alleges that defendant Prescon's product infringes his patent; Prescon alleges that the Lang patent is invalid and denies infringement. The issue of validity will be addressed first.

*Validity*

The Lang patent is entitled by statute to a presumption of validity which places the burden of proving invalidity on the party asserting it. 35 U.S.C. § 282; *Aluminum Co. of America v. Amerola Products Corp.*, 552 F.2d 1020 (3d Cir. 1977). Prescon argues that the Lang patent is invalid for a number of reasons: anticipation under 35 U.S.C. § 102; obviousness under 35 U.S.C. § 103 and indefiniteness under 35 U.S.C.

§ 112. Each of these contentions will be addressed in turn. As a preliminary matter, however, it should be noted that only claims 1, 2, 4, 6, and 8 of the patent are at issue in this litigation. (Tr. at 12–16). The independent claims 1 and 6 have been set out in full above. Claim 2[9] relates to certain characteristics of the invention, claims 4[10] and 8[11] simply specify that the multiple-wire strand is of high-tensile steel and the plastic is a high molecular weight polyethylene. All three are admitted to be dependent claims.

*Anticipation*

Prescon alleges the Lang patent is invalid under the provisions of subsections (a), (b) and (g) of section 102.[12] Under section 102(a) a patent is invalid if "the invention was known or used by others in this country . . . before the invention by the applicant for patent. . . ." Under section 102(b) a patent is invalid if "the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." Section 102(g) renders a patent invalid if "before the applicant's invention thereof, the invention was made in this

---

**8.** Extrusion is the process of shaping material by forcing it through a specially designed opening often after a previous heating of the material or of the opening or both. As will be developed more fully, *infra,* both the tightness and the configuration of an extruded plastic jacket can be altered by changing the nature of the opening, or extruder head, through which the molten plastic is squeezed.

**9.** The full text of claim 2 provides:
The tendon of claim 1 which allows tensile loading along its length during posttensioning such that a 200-foot long tendon passing circumferentially around one-half of a circular vessel has at least 75 percent of the tensile load transmitted from the jacked end to the unjacked end when the load at the jacked end exceeds 50 percent or more of the strand's breaking strength.

**10.** Claim 4 states: "The tendon of claim 1 in which the multiple-wire strand is of high-tensile steel and the plastic jacket is of a high molecular weight polyethylene."

**11.** Claim 8 states: "The process of claim 6 in which the multiple-wire strand is of high-tensile steel and the plastic is a high molecular weight polyethylene."

**12.** The full text of those subsections provides:
A person shall be entitled to a patent unless—
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

country by another who had not abandoned, suppressed, or concealed it." In order to invalidate a patent by evidence of such prior uses or sales the defendant must show that each element of the patent's claims is present in the prior use or sale which is alleged to anticipate the invention. It is not enough that a patent's elements are scattered among several prior art references; they must be contained within a single reference. *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 875 (3d Cir. 1977).

▮ Defendant carries a heavy burden to establish the prior use of a patented invention. The Third Circuit Court of Appeals has described it "as necessitating evidence that 'must be so strong as to remove all reasonable doubt thereof.'" *Jones Knitting Corp. v. Morgan*, 361 F.2d 451, 455 (3d Cir. 1966) (quoting *Smith v. Carter Carburetor Corp.*, 130 F.2d 555, 560 (3d Cir. 1942)). Subsequent Third Circuit appellate decisions have relaxed that standard somewhat to require only proof by clear and convincing evidence, at least in cases where the proffered proof of prior use is not wholly testimonial in nature. *See e.g. Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 875 (3d Cir. 1977); *Aluminum Co. of America v. Amerola Product Corp.*, 552 F.2d 1020 (3d Cir. 1977); *cf. Philips Electronic & Pharmaceutical Indus. Corp. v. Thermal & Electronic Indus., Inc.*, 450 F.2d 1164, 1168 n.4 (3d Cir. 1971) (citing *Jones Knitting* in support of use of clear and convincing standard). On the facts of this case the Court need not decide which of the two standards is applicable because defendant has failed to establish prior use by even the lesser, clear and convincing proof, standard.

Defendant alleges four specific instances of prior use: Carr in 1963; Shinko, Kabo-Karr in 1964–65; Danciger, Rowland in 1965; and Danciger, Florida Wire & Cable in 1969. As will become apparent, the Carr 1963 use and the Shinko, Kabo-Karr 1964–65 use form one analytic unit as does the Danciger, Rowland 1965 use and the Danciger, Florida Wire & Cable 1969 use. The two units will be examined in turn.[13]

As a preliminary matter a momentary pause is taken to explain an essential element to the understanding of this case—the meaning of the words "tight" and "tightly" as used in the phrase "tight jacket" of claim 6, and "plastic jacket tightly covering said incased strand" of claim 1. A more detailed explanation will be undertaken below under the heading of Indefiniteness; however, some understanding of the term's meaning is vital at the outset. As defined in the Lang patent, a tight jacket is one which substantially excludes air and gas from between the jacket and the corrosion inhibitor.[14] The essence of the Lang patent is that the plastic jacket is extruded onto a grease incased 7-wire strand so that the plastic comes into direct contact with, or "necks down" onto, the grease. The natural consequence of extruding a plastic jacket directly onto a grease incased strand is the substantial exclusion of air and gas. *See* pp. 25–26 *infra*. With that definition of the terms "tight" and "tightly" in mind, the Court turns to the alleged anticipation.

*Carr, Shinko, Kabo-Karr*

At his deposition in May 1980, Malcolm C. Carr testified[15] that he invented and re-

13. Prescon may also rely on two additional prior art references: the Lang India patent mentioned above and an article entitled "Recent Development in Prestressing Tendons," by K. W. Longbottom, published in *Concrete, The Journal of The Concrete Society*, February 1968 at 88–90 (the "concrete article"). Both references will be discussed below under the heading of obviousness. It is unclear whether defendant intended to rely on these references for anticipation as well. In any event, as the Court's subsequent discussion will indicate, neither reference can be said to contain all the elements of the challenged invention. Specifically the Lang India patent describes a monofilament wire rather than a 7-wire strand which is coated with oil rather than a corrosion inhibitor with greaselike consistency and the concrete article does not describe a tightfitting plastic jacket and may or may not describe a grease incasement.

14. (DX139). Column 2, Lines 37–40.

15. The deposition testimony of several witnesses including Mr. Carr, Clarence Zins, Yoshita Tanaka, and Loris Gerber were admitted into evidence at trial.

duced to practice a posttensioning tendon having a greased 7-wire strand covered with a seamless plastic extruded jacket in 1963. His testimony was corroborated in that regard by his plant assistant Clarence Zins. Prescon argues that the Lang patent is invalid under section 102(g) because Carr was a prior inventor in 1963. However, that argument fails when one examines the evidence on the existence of the critical element—the tight jacket over a grease incasement—in the Carr product. Mr. Carr testified that there was probably an average of one or two mils and perhaps as much as three or four mils of grease on the crowns (i.e., the outermost points) of the strand. (Tr. at 1825–26). In contrast, Mr. Zins testified at his deposition on May 21, 1980 that there were approximately 62.5 mils of grease on the crown of the strand. (DX187 at 30, 39, 96). The importance of this conflict in testimony becomes apparent when it is considered in conjunction with the testimony of Mr. Loris Gerber, defendant's director of manufacturing. Mr. Gerber testified on cross examination that based on his calculations (embodied in DX214) the grease space in the Carr product was 51 mils. (Tr. at 2125).[16] If as Mr. Carr testified there were only 2–4 mils of grease coating the crown of the strand, there would have been a gap of approximately 47–49 mils between the plastic sheath and the grease incasement. Thus the very essence of the Lang invention—the tight jacket formed by extruding down into contact with the grease so as to substantially exclude air and gas—would have been absent.

Mr. Carr also testified that the extruded jacket directly engaged the greased strand (Tr. 1829–30), which of course is inconsistent with his testimony when considered in conjunction with Mr. Gerber's credited testimony regarding the grease coating on the strand. That inconsistency serves to high-

light the danger of relying on oral testimony to establish a prior use which is alleged to have occurred seventeen years ago. The Supreme Court has urged caution in crediting such evidence:

In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required the proof shall be clear, satisfactory and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny.

*Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed Wire Co.*, 143 U.S. 275, 284–85, 12 S.Ct. 443, 447, 36 L.Ed. 154 (1892). Even taken in isolation the testimony of Carr and Zins about their work in 1963 cannot withstand that scrutiny. When it is examined in conjunction with the testimony of Mr. Yoshita Tanaka of Shinko Wire Co., their testimony, as well as that of Mr. Tanaka, is weakened even further.

Mr. Carr testified that after he developed his tendon he contacted Shinko to have it

---

16. Actually Mr. Gerber testified as to the grease space in the product sent by Mr. Carr to Shinko (a Japanese manufacturer). However, Mr. Carr testified that the product he sent to Shinko was in fact a sample of the product he produced in 1963. Thus, when their testimony is considered in conjunction, Mr. Carr and Mr.

Gerber testified as stated in the text. It should be emphasized that Mr. Gerber's calculations were based on a contemporaneous test report (DX76) and are thus entitled to considerably more weight than the seventeen-year old recollections of Mr. Zins and Mr. Carr.

made in commercial quantities for his company Karbo-Karr. In his initial letter Mr. Carr wrote that "the sheathing process demands a grease application directly over the strand to fill the strand to a true circle, and a polyethylene 20 mil sheath extruded over the grease and strand to contain and protect it." (DX61). Mr. Tanaka testified that Shinko then produced samples. The first two shipments were rejected by Mr. Carr because the jacket was too tight. The third shipment of two 6,000 foot reels in 1964 was thought to be satisfactory.

Once again, however, there is conflicting evidence as to what exactly was produced in 1964. Mr. Tanaka testified that the product shipped in 1964 included an extruded seamless plastic jacket tightly covering a grease incased strand. (Tr. 1644, 1714–20). As part of his testing procedure, Mr. Tanaka pulled out a length of strand equal to one foot, eight inches and saw no air pockets. Similarly, Mr. Zins testified that he examined the product received from Shinko and that the jacket was in direct engagement with the grease on the strand. (DX187 at 98).

At the same time both Mr. Tanaka and Mr. Zins testified that the grease layer on the crown of the strand was only 1 or 2 mils thick. In DX214 Mr. Gerber calculated from the dimensions given in a Shinko test report (DX76) that the space between the inside of the jacket and the strand on the commercial shipment sent in 1964 was 42, 47, 51 and 63 mils. (Tr. at 2127). If the space inside the jacket ranged from 42 to 63 mils and the strand only had a grease covering of 1 to 2 mils, there must have been an air space of 40 to 61 mils. Thus, the tendon produced by Shinko would not have had the crucial "tight jacket." [17]

If faced with no more than a conflict between the sixteen-year old recollection of Mr. Tanaka and Mr. Zins on the one hand and the calculations made by defendant's director of manufacturing from contemporaneous documents on the other, the Court would have no trouble in concluding that defendant has failed to carry its heavy burden of proof on this issue. However, there is additional evidence which casts even greater doubt on the accuracy of defendant's witnesses' recollections. At his deposition Mr. Tanaka was asked to translate a contemporaneous Japanese document which he identified as an advertisement for the product shipped to Kabo-Karr. The text of the advertisement (PX33) had originally been prepared by Mr. Tanaka who testified, in connection with his translation, that it met the claims of the Lang patent. A subsequently obtained certified translation of the document in question (PX33a) tells a very different story. The translation by a neutral expert states that the advertisement reported that the Shinko product was produced by "winding the flexible tube of synthetic resin around the outer circumference of the strand and then putting grease between the tube and the strand." Thus, based on the certified translation, it is uncertain whether the Shinko product, which Tanaka, Carr and Zins all testified met Kabo-Karr's specifications, even had an extruded jacket.

Finally, it is noted that Mr. Tanaka cannot be considered an unbiased witness because at the time of his deposition his company was opposing Mr. Lang's corresponding patent application in Japan. Moreover, Mr. Tanaka testified that defendant has been one of Shinko's major customers for more than ten years. (Tr. at 1739–40). In short, although there is some evidence to suggest that Carr, Zins and Shinko anticipated the Lang patent in 1963–64, there is considerable evidence to suggest they did not. The Court finds that Prescon has failed to demonstrate a prior use by Carr, Zins, or Shinko by clear and convincing evidence, let alone beyond a reasonable doubt.

*Danciger, Rowland, Florida Wire & Cable*

In 1964 Mr. Danciger approached Southwire Company to investigate the possibility

---

[17]. Mr. Tanaka also testified that Shinko's current product has a tighter jacket than that shipped to Kabo-Karr in 1964. (Tr. at 1707).

of producing a greased strand covered with an extruded plastic sheath. (Tr. at 1191). Southwire was a manufacturer of electrical cable and was well versed in extrusion techniques. Sometime in late February or early March 1965 Mr. Bobby Rowland, a Southwire employee, completed production of some 2,000 to 5,000 feet of strand. (Tr. at 1413–14). As was the case with Carr, Zins and Shinko, the question is not whether a product was produced in 1965, but whether that product contained all the elements of the Lang patent.

Mr. Danciger testified that he asked Mr. Rowland to produce a fully greased strand with an extruded jacket which was not "tight enough so as not to allow the strand to slip, yet not big enough to leave voids, that it had to be circular and not pull into the interstices of the strand." (Tr. at 1192). Mr. Danciger further testified that the voids he wanted to eliminate were the spaces formed between the grease and the jacket in a push-through tendon. *Id.* Both Mr. Danciger and Mr. Rowland testified that the product made in 1965 included a 7-wire strand incased in grease covered by a tight extruded plastic jacket. (Tr. at 1412–16 (Rowland); Tr. at 1197–98, 1280–82 (Danciger)).

As with Carr, Zins and Shinko, however, the contemporaneous documentation tends to discredit the oral testimony about the key element—the tightness of the extruded plastic sheath. By letter dated March 10, 1965 (DX112) Mr. Rowland informed Mr. Danciger as to the results of his trial run. In stating his conclusions, Mr. Rowland noted that he had demonstrated that "It is possible to *tube* a jacket on cable of this type with little or no problems." (emphasis supplied) In and of itself that statement has little significance. Writing in 1965, Mr. Rowland could not foresee the critical distinction which would be drawn in this trial between tubing over a greased strand (i.e.,

extruding with a tubing dye so that the plastic does not come into direct contact with the grease (Tr. 902–12)) and extruding directly onto it. However, when considered in conjunction with Mr. Danciger's prior letter of September 14, 1964 (DX113) to Mr. Rowland, that language takes on added significance. That letter accompanied a sample of lap seam tendon. As stated in the letter: "The purpose of the sample is to acquaint you with the tightness at which it has been laid around the strand. A slightly looser fit would be more desirable."

Given the fact that lap seam tendons have loose jackets Mr. Danciger's September 14, 1964 letter can be understood to be requesting a very loose jacket. If that were the case, the 1964–65 product would have simply been a push through tendon which had been manufactured by a more efficient process. Instead of inserting a greased strand in a previously extruded plastic tube, as was normally done with push through tendons, Mr. Danciger would have extruded the tube around the greased strand. If that were in fact the case, it would also explain why no mention of the radically improved friction characteristics associated with the Lang tendon were mentioned by Mr. Danciger at the time.[18] Indeed, Mr. Danciger testified that he saw the process as an alternative to push through tendon, as it was less expensive to produce. (Tr. at 1202–03).

Thus, once again the Court is presented with the uncorroborated oral testimony of two witnesses who claim to remember practicing the invention approximately sixteen years prior to the date of testimony. *See e.g. Jones Knitting Corp. v. Morgan*, 361 F.2d 451 (3d Cir. 1966). Worse, the testimony at trial shed doubt on Mr. Danciger's credibility. Mr. Danciger testified that he and his company had been attempting to locate any documents to invalidate the Lang patent for five years. (Tr. at 1327).

---

18. Although he stated that no friction tests were done at the time, Mr. Danciger did testify that they performed tests to determine force transmission. (Tr. at 1301–02). The two measures are simply different ways of expressing the same concept. The crucial issue is how much of the force applied to one end of the cable is transmitted to the other end. Thus, if the 1964 Danciger tendon had the Lang tendon friction characteristics, it should have been apparent in the force transmission test results. (See Tr. at 627–42).

Prescon was given full access to their files and nothing was held back from them. (Tr. at 1340–41). Despite that alleged willingness to produce documents, Mr. Danciger refused to talk to Prescon until the year before trial. (Tr. at 2007). Apparently at that time Mr. Danciger changed his mind and agreed for the first time to cooperate with Prescon to the extent of testifying at trial that his company invented the product in 1964. That change of mind came about at the same time that Prescon became a substantial customer of Mr. Danciger's Company, Florida Wire & Cable,—placing orders in excess of $250,000 per year. (Tr. at 1299–1300).[19] Given these circumstances the Court finds that the testimony of Mr. Rowland and Mr. Danciger is insufficient to establish a prior use in 1964.

Prescon argues that Florida Wire & Cable began production of the product in 1969. Again there is much documentary evidence to suggest that Florida Wire & Cable purchased an extruder and manufactured something at that time. However, the only evidence, other than Mr. Danciger's testimony, that it was the Lang tendon is a February 29, 1968 Memorandum by a J. Wood. (DX110). The two-page document discusses the possibility of setting up an extrusion line and analyzes some production possibilities. The top of the first page contains a sketch of a crossview of a tendon, one area of which is labeled "grease (High Temp)." On the bottom of the second page is a sentence which reads "Grease requirements in above tube to fill all cavities." In between those two statements there appear numerous material specifications and price quotations. Mr. Wood was not called as a witness at trial nor were counsel for either party able to give an explanation of the grease requirements given after the above-quoted line. (PTr. at 30–33; 104–05). The Court is therefore confronted with the questionable testimony of Mr. Danciger which is corroborated on the crucial point, the tightness of the jacket, only by an unexplained memorandum written by a faceless employee of Mr. Danciger's company in 1968. Based on these facts the Court finds that Prescon has also failed to establish a prior use by Florida Wire & Cable in 1969 by clear and convincing evidence.

To summarize the foregoing the Court finds that Prescon has failed to establish that the Lang patent is invalid on the grounds of anticipation.

*Obviousness*

Prescon alleges that the Lang patent is obvious within the meaning of section 103 [20] and therefore invalid. The Supreme Court outlined the factual analysis which must be undertaken to determine the issue of obviousness in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The court must first determine the scope and content of the prior art; then the differences, if any, between the prior art and the claims at issue must be ascertained. Finally, the level of ordinary skill in the pertinent art must be resolved. In addition, "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., [may] be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obvi-

19. It should also be noted that as late as May, 1970 Mr. Danciger wrote to Mr. Lang complimenting him on his invention which he acknowledged as an "entirely different product line from ours..." Indeed, Mr. Danciger suggested that "Perhaps we would even market it for you under our own trade name." (DX118). The product described in the literature sent to Mr. Danciger included a teflon coating. Thus arguably it was a different product than the one at issue here. However, the letter, which indicates great excitement about Mr. Lang's invention, does cast additional doubt on Mr. Danciger's testimony.

20. 35 U.S.C. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

ousness or nonobviousness, these inquiries may have relevancy." 383 U.S. at 17–18, 86 S.Ct. at 693–694.

*Scope and Content of the Prior Art*

The parties agree and the Court finds that the pertinent prior art includes all the prior art in the posttensioning industry which was discussed above at pp. 5–7, *supra.* Prescon also urges the four specific instances of prior use discussed under the heading of anticipation as well as an article entitled "Recent Developments in Prestressing Tendons," by K. W. Longbottom, published in *Concrete, the Journal of the Concrete Society,* February 1968 at 88–90 (the "concrete article") (DX6), as prior art references. The article describes a plastic covered tendon produced through an extrusion process and notes that "operating conditions can be varied to give either a sheath or a tight-fitting plastic cover." The Patent Trademark Office Board of Appeals considered the concrete article in the reissue proceeding and found the Lang invention to be patentable over it. As noted in this Court's March 5, 1980 Opinion, among the principal effects of a reissue proceeding is that the patentee is entitled to the usual presumption of validity as to any prior art invoked to invalidate the patent before the Patent Trademark Office in a reissue proceeding. *PIC Inc. v. Prescon Corp.,* 485 F.Supp. 1302, 1312 (D.Del.1980). The only evidence defendant relies on to rebut that presumption of validity is the testimony of Mr. Gerber who stated that the article either revealed each feature of claims 1 and 6 of the Lang patent or made those features obvious to one skilled in the art.

There are several problems with relying on the concrete article to invalidate the Lang patent. First, nowhere does the article mention the need to incase the strand in grease with a diameter at least two mils greater than the strand. The article simply states that the strand is covered with a "protective component." The only reference to the type of protection is a cryptic caption to Figure 2 of the article which reads in part: "strand protected with 'Metalcoat A' in an extruded-plastics sheath." Although the article nowhere discloses the nature of "Metalcoat A," Mr. Gerber testified that one skilled in the art would have known that the protection had to be a grease and would have naturally applied it in a circular incasement at least $\frac{1}{16}$ inch thick. (Tr. at 1968–70).

There is an additional problem with relying on the concrete article as a basis for a finding of obviousness. The Lang patent specifies that the grease incased strand must be covered with a tightfitting plastic sheath. The concrete article does describe an extrusion process and notes: "Operating conditions can be varied to give either a sheath or a tight-fitting plastics cover." However, in distinguishing the Lang patent from the concrete article, the Patent Trademark Office Board of Appeals concluded: "While the description of Figure 1 also further refers to a 'tight-fitting plastic *cover,*' ... it appears to us that this structure applies to a strand having a tight cover for *pretensioning utilizations.*" (DX140 at A 502 (some emphasis added)). The real focus of Prescon's argument is that the conclusion of the Patent Trademark Office Board of Appeals, which limits tightfitting language of the concrete article to pretensioning applications, is erroneous because neither grease nor a cover is used in pretensioning tendons. Instead, the concrete is allowed to bond to the bare wire strand. (Tr. at 1989; *see* Tr. at 681–82).

The testimony at trial did establish that the usual pretensioning procedure is to allow the concrete to bond to the bare strand. However, the concrete article suggests two uses for extruded plastic coatings, one for posttensioning and one for pretensioning. In pretensioning, a tightfitting plastic coating is used to protect the steel from corrosion as an alternative to galvanizing (coating the steel with zinc). The concrete is still allowed to bond to the strand because, as noted earlier, the weight of the concrete will tend to force the plastic into the interstices of the strand. The Court finds that the testimony of Mr. Gerber, defendant's vice-president, provides an insufficient basis

to read all three critical elements, the grease incasement of at least two mils in thickness covered by a tightfitting plastic sheath, into the concrete article. The Court therefore concludes that the article did not make the Lang invention obviousness.

Plaintiff concedes that all of the above-mentioned references (including those discussed in the introduction and under the heading of anticipation) were contained in the prior art but he argues that the prior art most closely pertaining to the Lang patent is the art of posttensioning and that extrusion should therefore be excluded from the definition of the prior art. The Court cannot agree. It is, of course, true that the Lang patent pertains to the art of posttensioning, but that does not mean that all knowledge of extrusion must be excluded. Extruded plastic tubes were used in making push through tendons, and both the Lang India patent and the concrete article clearly teach extrusion.[21] Thus, the Court finds that the prior art to which the Lang patent relates encompasses posttensioning combined with some knowledge of extrusion.

*Differences Between the Prior Art and the Claims at Issue*

■ The parties agree that the prior art contains each and every element of the Lang invention. The cigarette wrap tendon includes a 7-wire strand incased in grease and a plastic jacket. The push-through tendon, the concrete article and the Lang India patent all teach extruded plastic jackets. The Lang India patent's extruded jacket is tightfitting and "precludes voids, and thus markedly reduces corrosive elements, e.g., air and moisture from reaching the wire." (DX207 at 3). However, the fact that all of the individual elements of the Lang patent were contained in the prior art will not in and of itself invalidate it unless the combination of these elements would have been obvious to the ordinary skilled worker in the art. *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966);

*Philips Electronic & Pharmaceutical Indus. Corp. v. Thermal & Electronics Indus., Inc.*, 450 F.2d 1164 (3d Cir. 1971). Specifically, the combination here claimed to be obvious is a 7-wire strand incased in grease, of at least two mils in diameter, over which is extruded a tightfitting plastic jacket. That precise combination appeared nowhere in the prior art although each of its elements did. The issue before the Court is whether it would have been obvious to one skilled in the art.

*Level of Ordinary Skill*

■ In determining the level of ordinary skill in the relevant art the Court must look to the hypothetical "worker in the industry who is attempting to solve the problems the inventor addressed by means of the patented device." *Stanley Works v. McKinney Mfg. Co.*, 520 F.Supp. 1101, 1109 (D.Del. 1981), *aff'd mem.*, 681 F.2d 809 (3d Cir. 1982). The parties agree and the Court finds that those in the field of designing and manufacturing posttensioning tendons are graduate engineers (usually civil engineers) with substantial experience. Prescon's Post-Trial Brief at 22, Lang's Opening Post-Trial Brief at 36. (Tr. at 822–23, 1463). The only dispute is whether such individuals would have knowledge of extrusion techniques or know to look to those who did have such knowledge. As is apparent from the foregoing description of the prior art, extrusion had been used by those making tendons for some time. Indeed, Mr. Lang testified that in the course of developing his invention he researched extrusion techniques. (DX184 at 533). The Court therefore finds that those people of ordinary skill in the art would know to look to others, if necessary, for knowledge of extrusion techniques.

*Determination of Obviousness*

■ As explained above the prior art contains all the elements of the Lang patent. The concept of sheathing a grease

---

**21.** In addition, there is evidence that Carr, Danciger and Shinko, whose activities were discussed above, looked to the electrical cable industry for knowledge of extrusion techniques in the years preceding the Lang patent.

incased 7-wire strand in an extruded plastic jacket was well known. Tightfitting extruded plastic jackets were also known though they were not used in conjunction with 7-wire strand. The question before the Court is simply whether it would have been obvious to the hypothetical worker skilled in the art to sheath a grease incased 7-wire strand in a tightfitting extruded plastic jacket.

The evidence adduced at trial indicated that prior to the Lang invention those skilled in the art of posttensioning believed that the key to producing a successful 7-wire strand tendon was a loose sheath. As noted, one of the basic problems with the prior art was the tendency of the concrete to compress the sheathing material into the interstices of the 7-wire strand. Thus, those skilled in the art were attempting to develop tendons in which the sheath was loose.[22] For example, Mr. Gerber testified that in making paper wrapped tendons Prescon tried for a loose wrap to avoid friction problems. (Tr. at 1926–27). Similarly, when Stressteel Corporation attempted to apply a plastic wrap it found that a tight fit would cause the plastic to adhere to the strand, making it impossible to stretch the strand. It was in order to overcome this problem that Stressteel turned to the push through tendons which had loose jackets. (Tr. at 1144–45).[23]

In contrast the Lang patent teaches a "tight jacket." As explained in the specifications, the extrusion of a plastic jacket directly onto the greased incased strand "forms a tight seamless plastic jacket ... around said incased strand substantially excluding air and gas from between the jacket and the corrosion inhibitor." Column 2, lines 37–40; see also column 3, lines 16–19. Stated another way, although the prior art teaches the use of grease as a corrosion inhibitor and lubricant, Lang was the first to conceive of its use as a buffer between

the steel strand and the sheath. In order to achieve the vastly improved performance characteristics of the Lang invention a person of ordinary skill in the art would have to ignore the fact that tight sheaths ordinarily tend not only to interlock with the strand but to exhibit poor friction characteristics as well. See United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). Lang discovered that both problems, interlock and friction, could be prevented by providing a sufficient incasement of grease in a tight sheath so as to prevent the sheath from touching the strand notwithstanding the external pressures normally exerted on the tendon. Defendant's argument that that discovery was obvious is primarily based on its interpretation of the concrete article and the four prior uses discussed above; however, the Court interprets its argument as relying on all the prior art discussed above at pp. 5–7 as well. Having found that none of those prior art references teach a tightfitting sheath over a grease incasement of at least 2 mils in thickness, the Court has no difficulty in finding that the Lang invention would not have been obvious to one skilled in the art.

The Court's conclusion, that the Lang patent was not obvious, is bolstered by several secondary considerations. There was a long-felt need in the posttensioning industry for a tendon with low friction characteristics which could stand up to the physical abuse inherent in normal handling. (See e.g. Tr. at 153–54, 827, 1140–41, 1145). As is apparent from the Court's discussion of the prior art, the Lang tendon had significantly better handling characteristics. Similarly, the friction tests introduced into evidence indicate that the Lang tendon outperformed the prior art tendons by a large margin. (PX19). Moreover, the fact that defendant began to copy the Lang invention almost as soon as it was shown to defendant, see willful infringement discus-

---

**22.** The Lang Indian patent, which did teach a tight sheath, used a single filament wire rather than a 7-wire strand. Thus, in that case there was no problem of bonding with interstices.

**23.** Further support for the nonobviousness may be found in the experience of Kabo-Karr which was discussed above. In that case trial product runs were rejected because the jackets were too tight. (Tr. at 1618, 1620).

sion, *infra*, is also slight circumstantial evidence of nonobviousness. *See Arrow Safety Device Co. v. Nassau Fastening Co.*, 496 F.2d 644 (3d Cir. 1974). Based on the foregoing the Court concludes that Prescon has failed to establish that the Lang patent would have been obvious to one of ordinary skill in the art of posttensioning.

*Indefiniteness*

■ Section 112 requires that "[t]he specification . . . conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. Prescon argues that the word "tightly" in claims 1, 2 and 4 and the word "tight" in claims 6 and 8 are indefinite and therefore invalid under section 112. Viewed in isolation, the word "tight" or "tightly" could well be deemed indefinite. *See, e.g., Norton Co. v. Bendix Corp.*, 449 F.2d 553 (2d Cir. 1971) (patent invalid because terms "closely spaced" and "a substantial distance" not adequately defined). It is well established, however, that when a claim is ambiguous, a court may look to the specification and description of the invention for an explanation of the claim's meaning. *See Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968 (1902); *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870 (3d Cir. 1977). The Lang patent specification states that extrusion "forms a *tight* seamless plastic jacket . . . around said incased strand *substantially excluding air and gas* from between the jacket and the corrosion inhibitor." Column 2, lines 37–40 (emphasis added); *see also* column 3, lines 16–19.[24]

■ Apparently conceding that the Court may look to the specification, Prescon argues that the phrase "substantially excluding air and gas" is also vague and indefinite. The Court cannot agree. The requirement of section 112 serves two primary purposes:

those skilled in the art must be able to understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention. On the other hand, the policy of the patent statute contemplates granting protection to valid inventions, and this policy would be defeated if protection were to be accorded only to those patents which were capable of precise definition. The judicial function requires a balancing of these competing considerations in the individual case.

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136 (2d Cir.), *cert. denied*, 358 U.S. 884 (1958), *quoted in Jones Knitting Corp. v. Morgan*, 361 F.2d 451, 454 (3d Cir. 1966). The standard is a flexible one. "If the claims, read in light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more." *Id.* Measured against this standard the claims of the Lang patent are clear and definite.

■ As has been explained, one skilled in the art pertinent to the Lang invention would be familiar with the art of extrusion or would know to turn to one familiar with the extrusion art. All the witnesses who testified about the extrusion process, whether for plaintiff or defendant, agreed on several basic facts. First, by adjusting the length of the extruder head or mandrel and the speed of the production line, it is possible to control the tightness of the plastic sheath extruded onto the wire strand. Thus, for example, by using a long "tubing" dye it is possible to form a tube which surrounds but does not come into contact with the strand. Conversely, by using a shorter or "conventional" dye it is possible to extrude directly down into contact with the strand. (Tr. at 902–12, 2119–20).

---

**24.** During the reissue proceeding before the Patent Trademark Office plaintiff also urged that by extrusion he could "exclude air pockets from inside the jacket and that the exclusion of air pockets was essential to producing a prod-

uct that enabled a more uniformly distributed tensile load along the strand. . . ." Brief on Appeal before Board of Appeal Patent and Trademark Office at 13. (DX140 at 250).

Second, the witnesses agreed, and defendant conceded at oral argument that the natural result of extruding directly down onto a greased incased wire strand is to substantially exclude air and gas. *See, e.g.,* PTr. at 58–59; Tr. at 205–07 (Lang); Tr. at 1457 (Rowland). In contrast, if a plastic tube were extruded over the grease incased strand, air and gas would be present throughout the length of the tube. The court finds that one skilled in the art would understand or at least have ready access to those who would understand that in order to form a tight jacket by extruding and shrinking a seamless tubular, jacket, so as to substantially exclude air and gas from between the jacket and the corrosion inhibitor, he would have to extrude directly down onto the grease incased wire strand. The Court finds that the patent teaches with sufficient conciseness how the invention is to be applied and also gives a would-be infringer sufficient warning of the patent's limits.

## Dependent Claims

Defendant attacks the validity of claims 2, 4 and 8 on the same grounds asserted against claims 1 and 6. Inasmuch as the Court has rejected those arguments, *supra,* there is no need to repeat the analysis at this point. The Court finds that defendant has failed to carry its burden of proving claims 2, 4 and 8 invalid.

## Infringement

Plaintiff has the burden of proving infringement by a preponderance of the evidence. *International Election Systems Corp. v. Shoup,* 452 F.Supp. 684, 704 (E.D. Pa.1978), *aff'd,* 595 F.2d 1212 (3d Cir. 1979). Prescon admits its product consists of a 7-wire steel strand which is covered by a circular incasement of corrosion inhibitor 5 to 20 mils in thickness. (Tr. at 742–43; Tr. 754–55). It also admits that the incased steel strand is then covered by a seamless plastic jacket formed by extrusion and shrinking. (Tr. at 759). Thus, defendant's

only remaining argument is that their extruded plastic jacket does not tightly cover the incased strand. In support of that argument, Mr. Gerber testified that in 1974 or 1975 he saw Prescon's tendon formed without pigment in the jacket and that the product had substantial air pockets. In addition, about a month before trial he had a 3,000 foot reel of strand made without pigment in an otherwise normal commercial run. That product also had air pockets. Prescon argues that since its product has many air pockets, it does not substantially exclude air and gas and is therefore not tight within the meaning of the Lang patent.

Defendant's argument misses the point. As explained, *supra,* a person of ordinary skill in the art of posttensioning would understand the Lang patent's reference to substantially excluding air and gas to mean nothing more than that the plastic must be extruded down into contact with the grease. The existence of air pockets trapped inside the grease is immaterial; the important distinction is between jackets extruded into contact with the grease incasement and those tubed around it. Indeed, Prescon conceded this point in post-trial argument and urged simply that Prescon does not extrude down into contact with the grease incasement. (PTr. at 107–08).

The evidence adduced at trial refutes that assertion. Mr. Rogers testified that when he first set up the extruder line for Prescon in 1972, he designed it so that the plastic would come into contact with the grease. (Tr. at 1009–10). Mr. Gerber testified that whatever the configuration of the grease when first applied to the strand, it would be circular after the plastic sheath had been applied. (Tr. at 754–56). Professor Richards, plaintiff's expert witness, testified that the Prescon tendon he examined was filled with grease.[25] (Tr. at 735). Finally, Mr. Richard Halliburton testified that at least up until the time he left Prescon's employ in May 1979 the plastic was "ex-

---

**25.** Professor Richards also opined that the similarity in performance characteristics of PIC and Prescon tendons was due to the fact that

both were formed by extruding directly onto the grease incasement. (Tr. at 653, 656–57).

truded onto the strand the grease." (Tr. at 771–73). The Court finds that the Prescon tendon is formed by extruding a plastic jacket directly onto a grease incasement so as to form a seamless plastic jacket tightly covering a grease incased strand, and concludes that Prescon does infringe both the product and process claims of the Lang patent.

*Willful Infringement*

■ Plaintiff argues that he is entitled to treble damages under 35 U.S.C. § 284[26] and an award of attorneys' fees under 35 U.S.C. § 285[27] based on defendant's allegedly intentional and willful infringement. The actual amount of any such awards would, of course, have to await the separate trial on the issue of damages. At this point, the Court must determine whether defendant's conduct was sufficiently egregious to justify such enhanced remedies.

In 1967 Mr. Lang visited Prescon and demonstrated the product disclosed in the Lang India patent. (Tr. at 186–88). Prescon was very impressed with that demonstration and expressed an interest in the product. (Tr. at 188–93; PX24, PX25, PX26). Thus, it was only natural that when, in 1970, Lang produced the product in accordance with his invention, he sent samples to Prescon. (Tr. at 304). By letter dated April 8, 1970 Mr. Gerber, in his capacity as Vice President of Technical Services at Prescon, acknowledged receipt of those samples. (PX7). Mr. Gerber stated that Prescon was "quite impressed with the appearance of the product and would appreciate receiving quotations as offered in [plaintiff's covering] letter." In addition, Mr. Gerber informed plaintiff that Prescon was planning to test various types of strand and requested a 100 foot length of plaintiff's strand to be incorporated into the test. (PX7). Mr. Lang sent Prescon the strand requested at no charge. (PX6). During an

October 1970 meeting in Minneapolis, Mr. Gerber informed Mr. Lang that the test results on his product had been excellent. (Tr. at 306–07). At that time Mr. Lang informed Prescon that he had filed a patent application. (Tr. at 307 (Lang); Tr. at 1953 (Gerber)). Mr. Gerber later confirmed the test results by letter dated December 4, 1970, and indicated that use of plaintiff's product could result in a 50% savings in stressing costs and perhaps a 15% savings in placement costs. (PX28). In 1971 Mr. Al Spalmer, Prescon's eastern manager, requested and received an additional 305 feet of strand for testing in one of Prescon's construction projects. Mr. Spalmer reported that the Lang tendon performed to expectations and requested a price quotation for a large quantity of Lang's tendons. Mr. Spalmer stated that using Lang's product would save Prescon a considerable sum of money. (Tr. at 309–12). By letter dated August 29, 1972 Mr. Lang sent Prescon a copy of United States Letters Patent No. 3,646,748. (PX20).

Prescon first began to explore the possibility of setting up an extrusion line in the spring of 1971, months after it had tested plaintiff's product. (Tr. at 920). In July 1971 Prescon hired Mr. Rogers of Capitol Wire & Cable to set up an extrusion line for manufacturing posttensioning cables. (Tr. at 931–32). Prescon's goal was to produce a tendon with the lowest possible friction characteristics. (Tr. at 1013). Mr. Rogers had an extruder line running by March 1972, but it broke down almost immediately. (Tr. at 961–62). By the time it was back in operation, in June 1972, Prescon had or was about to receive a copy of the Lang patent (June 26, 1972). (Defendant's Response to Interrogatories 17, Tr. at 741–42, Tr. at 2147).

Having previously rejected Prescon's position that it did not infringe the Lang

---

**26.** Section 284 provides in part: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement ... the court may increase the damages up to three times the amount found or assessed."

**27.** Section 285 provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

patent, the Court has no hesitation in finding, based on the foregoing facts, that Prescon intentionally set out to copy the process and product described in the Lang patent. Prescon saw the Lang product, was told how it was produced and set out to duplicate it with full knowledge that Mr. Lang had filed a patent application.[28] Indeed, by the time Prescon began production in earnest, it had the actual patent in its possession. Prescon's only defense to the charge of intentional and willful infringement is that it acted in the good faith belief that the patent was invalid. Yet the only support cited for that belief is the understanding of two of defendant's employees, Mr. Gerber and Mr. Rogers, that the patent was for a common tubing process and therefore invalid. (Tr. at 965, Tr. at 1954).

As explained above, there was nothing novel about the extrusion process included in the Lang patent. However, that was not the essence of Mr. Lang's invention. This is not a case where defendant secured an opinion of counsel regarding the validity of the Lang patent.[29] *Cf. Union Carbide Corp. v. Graver Tank Mfg. Co.*, 282 F.2d 653 (7th Cir. 1960), *cert. denied*, 365 U.S. 812, 81 S.Ct. 695, 5 L.Ed.2d 691 (1961); *Imperial Chemical Industries, PLC v. Henkel Corp.*, 545 F.Supp. 635 (D.Del.1982). Nor did Prescon undertake an examination of the prior art. Instead defendant undertook a broad based attack on the patent. At one time or another in the course of this lawsuit defendant has asserted almost every possible ground of invalidity and denied infringement based on the absence of almost every element of the Lang patent. As is apparent from the foregoing, Prescon was finally forced to abandon all but three grounds of invalidity and to rest its noninfringement argument on the slenderest of reeds—the failure to extrude down into contact with the grease incasement.

Nonetheless, having undertaken this epic battle without the benefit of legal advice or an examination of the prior art, Prescon alleges it made a good faith judgment that the Lang patent was invalid. If the Court were to accept defendant's position, it would mean that any willful infringer could obtain the benefit of the patent, gamble on its invalidity and then avoid additional penalties by simply refusing to obtain outside advice and relying instead on the opinion of its hired help that the patent was invalid. Perhaps in some cases such a position may be defensible, but on the facts of this case involving the intentional copying of a process and product admitted to obtain results vastly superior to any known in the prior art, the Court concludes plaintiff has satisfied his burden of proving willful infringement by Prescon of the Lang patent. *See Milgo Electronic Corp. v. United Business Communication*, 623 F.2d 645, 665–66 (10th Cir.) (per curiam), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *American Safety Table Co. v. Schreiber*, 415 F.2d 373, 378–79 (2d Cir. 1969). The Court finds that defendant's infringement was intentional and willful thereby justifying increased damages and attorneys' fees under 35 U.S.C. §§ 284 and 285. The calculation of damages, the degree to which they will be increased, and the assessment of attorneys' fees must await the damage phase of this trial.

An order will be issued in accordance with this opinion.

---

**28.** There is evidence to indicate that at one time Prescon believed the patent was directed to the use of a teflon coating. (Tr. 1953–54). Even if that were the case, Prescon had the actual patent in its possession within days after its extruder line was in permanent operation.

**29.** At one time Prescon did assert the defense of advice of counsel, but that ground was withdrawn prior to trial.